# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3233 | **DATE** | 6/28/2001 |
| **CASE TITLE** | Virginia Peinado vs. Norwegian American Hospital, Inc., et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Hospital's motion for summary judgment (Doc. No. 30) is granted. Because the remaining state law claims are dismissed without prejudice, Defendant Alcasid's motion for summary judgment with respect to the false imprisonment claim (Doc. No. 33) is denied without prejudice as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | **3** | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | JUL 0 2 2001 | | 47 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 JUN 29 AM 11: 50 | 6/28/2001 date mailed notice | | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VIRGINIA PEINADO,             )

    Plaintiff,             )

        v.                 )       No. 99 C 3233

NORWEGIAN AMERICAN HOSPITAL, INC.,  )        Judge
and DR. DANIEL ALCASID, M.D.,       )    Rebecca R. Pallmeyer

    Defendants.          )

DOCKETED

JUL 0 2 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Virginia Peinado brings this action under Title VII of the Civil Rights Act against her employer, Defendant Norwegian American Hospital, Inc. ("Hospital"), alleging that she was subjected to sexual harassment by one of her co-workers, Dr. Daniel Alcasid, and, despite her complaints, the Hospital did not take sufficient remedial measures. Plaintiff also brings state law claims for false imprisonment and battery against Alcasid. The Hospital now moves for summary judgment, arguing that Plaintiff did not suffer any actionable harassment at the hands of Alcasid, and, even if she did, the Hospital cannot be liable for that harassment because it took appropriate steps to stop Alcasid's improper conduct. Alcasid also moves for summary judgment on the false imprisonment count. For the following reasons, Defendant Hospital's motion for summary judgment is granted. Additionally, because the court resolves all of the federal issues in this case by granting summary judgment for the Hospital, the court dismisses without prejudice Plaintiff's state law claims against Alcasid.

47

## FACTUAL BACKGROUND

### A.     The Parties

Plaintiff Virginia Peinado began her employment with Norwegian American Hospital on March 23, 1994 as a Physician Referral Consultant. (Hospital's Statement of Material Facts Made to Which There is No Genuine Issue Pursuant to Local Rule 56.1 (hereinafter "Def.'s 56. Statement) ¶¶ 2, 8.)   In this capacity, she helped individuals find a physician that would fit their personal needs. (*Id.* ¶ 8.) During this time, she was located in the Physician Specialty Center of the Hospital.  (*Id.* ¶ 9.)

In February 1997, she was promoted to the position of Employee Health Services Coordinator, which remains her job today. (*Id.* ¶¶ 15, 17.) In this position she reports employee injuries, follows up on these injuries, insures that employees have their annual physicals, and follows up on annual screening for employees. (*Id.* ¶ 17.) When Plaintiff first became the Employee Health Services Coordinator, she moved from the Physician Specialty Center of the Hospital into the Health Works clinic, an occupational health medicine clinic which contracts with local companies to provide medical services to employees. (*Id.* ¶ 25.)

Defendant Dr. Daniel Alcasid, an occupational physician, works with Plaintiff in the Health Works clinic. (Alcasid Dep., at 52.)  He is the only physician in that clinic. (*Id.*)  When Plaintiff first started at the Health Works clinic, her office was in close proximity to Alcasid's office and she interacted with him regularly in the course of her work. (Pl.'s Dep., at 20, 40.) Plaintiff estimated that they would talk more than twice a day, whenever Alcasid had questions or comments for her about particular

2

newly-hired or injured employees that he examined. (*Id.* at 40.) Alcasid is not, however, in any sort of supervisory role with Plaintiff nor has he ever been; he does not review her performance, nor does he have any involvement in setting her rate of pay or pay increases. (Def.'s 56.1 Statement ¶ 52; Pl.'s Dep., at 38-39.)

Instead, from February 1997 until some time in 1998, Plaintiff reported to Janina Nieves, the Director of Ambulatory Services. (*Id.* ¶¶ 12-13.) In addition, when Plaintiff accepted the promotion to Employee Health Coordinator, she also began reporting to Maila Parga, who at that time was the Director of Human Resources for the Hospital. (*Id.* ¶ 8.) Plaintiff reported to both Parga and Nieves until May 1997, when Parga left the Hospital. (*Id.* ¶ 20.)[1] At that time, Plaintiff reported only to Nieves until July 1997, when Russell Dickow took over Parga's position and became Plaintiff's supervisor along with Nieves. (*Id.* ¶ 20.) Some time during 1998, Plaintiff began reporting solely to Dickow. (*Id.* ¶ 21.) During all relevant time periods of this lawsuit, Alcasid reported to Plaintiff's supervisor Nieves for all administrative matters. (*Id.* ¶ 58.)

Prior to November 20, 1997, Nieves observed Plaintiff and Alcasid interacting and did not observe any problems between them. (*Id.* ¶ 62.) Plaintiff herself recalled that at one point she asked Alcasid for his advice on how she could obtain a salary readjustment and from time to time she would discuss personal problems with him as

---

[1] Parga pointed out that both she and Nieves supervised Plaintiff for this short time, but Plaintiff would have brought any complaints and problems to Nieves, because Plaintiff had worked on a full time basis for Nieves before that time. (Parga Dep., at 60.)

she did with the rest of the staff. (Pl.'s Dep., at 123-24.) On several occasions, when Alcasid invited the department out to dinner, Plaintiff would join the group, but Alcasid and Plaintiff never socialized outside of work out of the presence of other colleagues. (*Id.* at 119-122.) Alcasid would also bring in lunch occasionally for the whole department and Plaintiff attended those lunches approximately twice a month. (Def.'s 56.1 Statement ¶¶ 64, 67, 71.)

## B.    Plaintiff's Sexual Harassment Claim

According to Plaintiff, Alcasid began his sexually harassing behavior in February 1997. As she explains, most of this harassment in the beginning was not directed towards her, but, rather, to women in general. (Pl.'s Dep., at 74.) For example, whenever the clinic was not busy, Alcasid would "[hang] out" in the waiting room with male colleagues, where he often made comments about women walking by, sometimes in Tagalog, a language Plaintiff does not understand. (Def.'s 56.1 Statement ¶ 82; Pl.'s Dep., at 84, 143-44.) Plaintiff would hear the comments as she passed through the area, not while she was working in her office. (Def.'s 56.1 Statement ¶ 83.) Plaintiff testified that walking through that area was uncomfortable for her because Alcasid and others were laughing and speaking Tagalog, so she would try to pass by without being seen. (Pl.'s Dep., at 85.)

Alcasid also frequently used profanity in the workplace and told jokes with explicit sexual content or innuendo to his co-workers. (*Id.* at 66-68, 154.) As an example, Plaintiff noted that if a person were holding a can, Alcasid would comment, "nice can." (*Id.* at 154.) His jokes frequently referred to female reproductive organs.

4

(*Id.* at 68.) If a woman walked by the place where Alcasid was sitting, he would make remarks such as "there goes my lunch," or "Oh my God, all the things I could do with her." (*Id.*, at 66-67.) On one occasion, when asked what flavor of pizza he had ordered for lunch, he replied that the pizza was the flavor of his penis. (*Id.* at 67.) Alcasid would also regularly state that he was "horny," that he needed a woman, or that he had had a really busy weekend with his date. (*Id.* at 78.) Alcasid would use words such as "fuck," "motherfucker," "stupid," and "idiot" in the workplace. (*Id.* at 73.)[2] Plaintiff acknowledges, however, that none of Alcasid's comments were directed towards her personally and that he never made any comment about the clothes she wore or her body parts. (*Id.* at 74, 114.)

During this time, the Hospital had a formal policy prohibiting sexual harassment in the work place. (Def.'s 56.1 Statement ¶ 31.) That policy allowed employees to bring complaints of harassment to their department directors, administrative representatives, or the Director of Human Resources. (*Id.* ¶ 36.) Plaintiff did not complain directly to Alcasid about his language, but she contends that on four separate occasions she did complain to her supervisor, Nieves, about Alcasid's

---

[2] Many of the events to which Plaintiff testified in her deposition are corroborated by the deposition of Debra Sierra, a medical assistant who worked occasionally with Alcasid when his department was understaffed. (Sierra Dep., at 7-8.) Sierra's deposition includes references to the same commentary that Plaintiff described, such as "There goes my lunch," and Alcasid's use of the word "fuck" in the workplace. (*Id.*, at 17, 24.) In some instances, Sierra's testimony is more detailed or refers to more offensive behavior than complained of by the Plaintiff. For example, Sierra describes some of Alcasid's commentary about the Bill Clinton – Monica Lewinsky scandal, and describes more offensive language used by Alcasid. (*Id.*, at 17, 37, 41.)

inappropriate jokes and profanity. (*Id.* ¶ 97; Pl.'s Dep., at 69, 70-75.) The first time she complained was before her move to the Health Works clinic and the next three times were sometime between February and late March 1997. (Def.'s 56.1 Statement ¶¶ 97, 98.) According to Plaintiff, after the last three complaints, Nieves told her that she would talk to the doctor but Alcasid continued to tell jokes and make offensive comments after that time. (*Id.* ¶¶ 99-100.) Plaintiff did not complain again until November 20, 1997, because she felt Nieves was not doing anything about her complaints. (*Id.*) At some point, in response to Plaintiff's complaints that Alcasid was always telling jokes, Nieves responded, "that is the way he is, he tells jokes." (*Id.* ¶ 109.)

According to Nieves, however, Plaintiff did not make repeated complaints about Alcasid's behavior. (Nieves Dep., at 65, 81.) Instead, Nieves recalled only one occasion where Plaintiff stopped by Nieve's office to drop something off and told her "Dr. Alcasid is telling his jokes again." (*Id.* at 65.) Nieves could not recall when this conversation occurred. (*Id.*) According to Nieves, Plaintiff did not seem upset at the time or very disturbed by the behavior, but, rather, made the comment in passing. (*Id.* at 81.) It was at this time that Nieves responded "that is the way he is, he tells jokes." (*Id.* at 66.) Nieves contends that if Plaintiff had told her that she was offended by Alcasid's jokes, Nieves would have "taken action." (*Id.* at 81.)

Nieves did admit that she herself had heard Alcasid make jokes of a sexual nature, but she explained that she did not observe any employee take offense to his jokes. (Def.'s 56.1 Statement ¶¶ 123, 124.) Instead, she observed people laughing at

6

the jokes and even thought that she remembered some employees telling Alcasid that the jokes were good. (Nieves Dep., at 48.) She also testified that on several occasions she was present when Alcasid told a joke in front of Plaintiff and Plaintiff had "no objection" and "laughed like everyone else laughed." (*Id.* at 79.) Nieves did, however, tell Alcasid at one point that his jokes were inappropriate for the workplace, but she could not recall when this conversation would have occurred. (Nieves Dep., at 49; Def.'s 56.1 Statement ¶ 125.) She did not take him into her office at the time, and admits that she told him this more as "a co-worker as opposed to a supervisor" reprimanding him. (Nieves Dep., at 49.) She told him this because she personally felt that some of the things he said were inappropriate; she did not tell him this in response to anything Plaintiff or anyone else said to her. (*Id.* at 52.) In fact, she contends that no one complained to her about Alcasid's conduct before November 20, 1997, except for Plaintiff's passing comment about Alcasid "telling his jokes again." (*Id.* at 52.) After Nieves told Alcasid that his jokes were inappropriate, he told her he understood her concern but he continued to tell sexually-oriented jokes after that time. (Def.'s 56.1 Statement ¶¶ 125-26.) Because Nieves did not see any problems caused by the jokes, she did not talk to him again about his behavior. (*Id.* ¶ 126.)

C.    **Events on November 20, 1997**

Until November 20, 1997, Plaintiff admits that Alcasid's allegedly harassing behavior was not directed at her. (Pl.'s Dep., at 74, 114.) On November 20, 1997, however, Alcasid entered Plaintiff's office to talk to her about the request she had made to Nieves for a salary increase. (*Id.* at 42.) Upon Alcasid's suggestion, he and Plaintiff

moved to Alcasid's office to talk. (*Id.*) Once Plaintiff was in his office, Alcasid locked the door and grabbed her, kissing her forcefully and touching her breasts and buttocks. (*Id.* at 42-43.) Plaintiff testified that Alcasid was shaking at the time and holding her "really hard." (*Id.* at 43.) According to Plaintiff, Alcasid told her how much he needed her, how much he needed a woman, and that he hadn't "had" a woman since his ex-wife. (*Id.* at 42.) Plaintiff then pushed him away from her and fell into a chair. (*Id.*) Shortly thereafter, she got up and walked out of his office, unlocking the door by turning the doorknob. (*Id.* at 43.) As she was leaving, she spat, causing him to say, "Don't I kiss good?" (*Id.* at 49.) She went directly from his office to the washroom where she washed her mouth and hands before she returned to her own office. (*Id.* at 43, 50.) Shortly after she returned to her office, Alcasid entered the room, touched her cheek, and walked out without speaking. (*Id.* at 51-52.)

After Alcasid left her office, Plaintiff went to the dental section of the Hospital and called her friend, another Hospital employee named Adrianna Gutierrez. (*Id.*, at 52-53.) That same day, after speaking with Gutierrez, Plaintiff reported the incident to Nieves. (*Id.* at 54.) Nieves responded with disbelief, and said that she would speak with Dickow the next day, November 21, 1997. (*Id.* at 54-55.) On the morning of November 21, 1997, Plaintiff, Nieves, and Dickow met in Dickow's office, and Nieves and Plaintiff told Dickow about the incident with Alcasid. (*Id.* at 58-59, 61-62; Dickow Aff. ¶¶ 17-18.) Plaintiff also told Dickow that Alcasid had never done anything like that before, and that she had never before felt any concern about being with him. (Pl.'s Dep., at 62, Dickow Aff. ¶ 19.) Plaintiff testified that she was surprised by Alcasid's

behavior and thought it was unexpected, because prior to that day he had not done or said anything that made her believe he might grab, kiss, or grope her. (Pl.'s Dep., at 85.) He had not asked her out on dates or tried to establish a romantic relationship with her in any way. (*Id.* at 48.) At this meeting, however, Plaintiff did say that Alcasid used profanity in the work place, told inappropriate jokes, and remarked about how he needed a woman. (Dickow Aff. ¶ 20.) According to Dickow, Plaintiff also said that she did not know if anyone had complained about Alcasid's inappropriate jokes before this time. (*Id.*) Dickow testified that this meeting was the first time he had ever received any complaint about Alcasid. (*Id.*)

In response to Plaintiff's complaint and her request not to go back to Health Works that day, Dickow allowed her to work in an area distant from Alcasid's office for the remainder of that day. (*Id.* at 62, 63.) The same day, Dickow and Nieves met with Alcasid, together with Dr. Lopez, the Medical Director at the Hospital, to discuss his conduct. (Def.'s 56.1 Statement ¶ 156.) Alcasid admitted that he had locked the office door and kissed Plaintiff, but he denied touching her breast. (*Id.* ¶¶ 159, 160; Alcasid Dep., at 80.) He also admitted that after the incident he came into Plaintiff's office and touched her face. (Def.'s 56.1 Statement ¶ 160.) According to Alcasid, he had wanted to be on a more intimate basis with her. (*Id.* ¶ 159.) He also admitted that he told jokes and used profanity, but contended that he only did this with certain people. (*Id.* ¶ 160.)

Dr. Lopez suspended Alcasid for five weeks without pay pending further investigation. (Dickow Aff. ¶¶ 28, 31.) Lopez also informed Alcasid that if he came

9

back to the Hospital, it would be under certain circumstances, including going through the Employee Assistance Program.[3] (Def.'s 56.1 Statement ¶ 162.) Because Alcasid admitted most of Plaintiff's story, the Hospital did not perform much more of an investigation, but Dickow did interview Barbara Rogers, a licensed practical nurse in Health Works, who had worked with Alcasid for more than nine years. (*Id.* ¶ 163.) Rogers confirmed that Alcasid told jokes of a sexual nature. (*Id.* ¶ 164.) After this interview, the Hospital management decided that Alcasid's suspension would continue from November 21, 1997 until December 29, 1997. (*Id.* ¶ 166.) Additionally, the Hospital warned Alcasid that if he returned, he was to have no further contact with Plaintiff other than contact required in performing his duties and he would have to stop using profanity and telling jokes at work. (*Id.*) Finally, the Hospital warned Alcasid that he would be faced with future discipline, including termination, if any meritorious complaints of sexual harassment were made against him in the future. (*Id.*)

On December 19, 1997, Alcasid signed a Last Chance Agreement with the Hospital in which he agreed to undertake personal counseling, including sessions at least once a week, to have no contact with Plaintiff without permission, and to refrain from using vulgar language while at the Hospital. (Exhibit K, Hospital's Exhibits Supporting Its Motion for Summary Judgment, Last Chance Agreement at 1.) Plaintiff testified that Alcasid continues to tell jokes, though not as often as before, but she was

---

[3]      Neither party explains what exactly this program is.

unable to describe the jokes or state how often they occurred because she now closes her office door. (Pl's Dep., at 88.) Plaintiff admitted that since the November 20, 1997 incident, however, Alcasid has not touched her or engaged in any inappropriate conduct toward her. (Def.'s 56.1 Statement ¶¶ 181-82.) She nevertheless maintains that Alcasid should have been fired, not just suspended. (*Id.* ¶ 184.)

D.    **"Culture of Harassment" at the Hospital**

In addition to the November 20, 1997 incident and Alcasid's jokes, comments and profanity, Plaintiff maintains that there was a "culture of harassment" at the Hospital which allowed Alcasid to behave the way he did and should have put her employer on actual notice of the harassment to which she was subjected. To support this theory, she points to the testimony of Maila Parga. Parga testified that there was a social hierarchy at the Hospital with the doctors at the upper level. (Parga Dep., at 64.) Parga noted the disparity in the social hierarchy levels occupied by Plaintiff, a clerical employee, and Alcasid. (*Id.* at 65.) She also testified that at least three sexual harassment complaints had been lodged against a high level official of the Hospital, two of which were brought sometime in 1995, and one before that time, accusing the official of using inappropriate language and making sexual advances. (*Id.* at 69-70.) Each of these three cases settled. (*Id.* at 76.) She also testified that certain department directors had asked people for dates at work. (*Id.* at 86.)

According to Parga, these incidents and other behavior by the same officials influenced the treatment of female employees at the Hospital because "a lot of the male employees didn't feel that they needed to take the harassment policy seriously." (*Id.*

11

at 85.) For this reason, she felt that her efforts to enforce the harassment policy were ineffective. (*Id.* at 86-87.) She also testified that "a lot of the managers were intimidated when dealing with the doctors." (*Id.* at 119.) She admitted, however, that this conduct had "slowed down" and "wasn't as obvious in '97." (*Id.*)

### E. Plaintiff's Employment Today

Plaintiff continues to work at the Hospital today, as does Alcasid. Since November 20, 1997, Plaintiff has had two opportunities to change positions, which would have allowed her to work in an area distant from Alcasid, but she declined both. (Pl.'s Dep., at 97-99.)[4] She turned down the first because she did not like the supervisor, (*id.* at 97), and rejected the second opportunity to move because she "didn't feel that it was fair that [she] had to . . . leave to accommodate [Alcasid]." (*Id.* at 99.) Plaintiff acknowledges that neither of these changes would have entailed economic detriment to her; in fact, the first would have represented a slight increase in compensation. (Pl.'s Dep., at 97.)

### DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[4]     It does not appear that the Hospital offered Plaintiff these positions as a result of her complaints. Rather, Plaintiff herself applied for and was given one of the positions, but then decided she did not want to take it. (*Id.* at 98-99.) The other position was offered to her as an opportunity to work in the Human Resources Department. (*Id.* at 98.)

to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wade v. Lerner New York*, 243 F.3d 319, 321 (7th Cir. 2001). In determining whether any genuine issues of material fact exist, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)(citing *Anderson*, 477 U.S. at 248).

## A.    Plaintiff's Hostile Work Environment Claim

Sexual harassment is actionable under Title VII only if "it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Clark County Sch. Dist. v. Breeden*, 121 S.Ct. 1508, 1509 (2001)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)(quotation marks omitted); *see also Murray v. Chicago Transit Auth.*, No. 99-3774, __ F.3d __, 2001 WL 493433, at *6 (7th Cir. May 10, 2001). To determine whether harassment is actionable, courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County*, 121 S.Ct. at 1510. The test for determining whether harassment is actionable is both subjective and objective; the plaintiff must establish both that a reasonable

13

person would find the harassment created an abusive working environment and that she, in fact, did perceive it to be so. *Gentry v. Export Packaging Co.*, 238 F.3d 842 (7th Cir. 2001).

While employers "are vicariously liable for hostile environment sexual harassment by supervisors (subject to certain defenses)," *Faragher v. City of Boca Raton*, 524, U.S. 775, 807 (1998); *Ellerth v . Burlington Industries, Inc.*, 524 U.S. 742, 764-65 (1998), a plaintiff must show negligence in order to hold an employer liable for co-worker harassment. *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431-32 (7th Cir. 1995); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). If an employer takes reasonable steps to discover and rectify acts of sexual harassment of its employees, its legal duty is discharged. *Wilson v. Chrysler Corp.*, 172 F.3d 500, 508 (7th Cir. 1999); *Baskerville*, 50 F.3d at 432.

Plaintiff contends that she suffered harassment that was severe and pervasive, both because she was subjected to Alcasid's comments, jokes, and profanity on a regular basis before November 20, 1997 and because of the incident that occurred on November 20, 1997. The Hospital contends that prior to November 20, 1997 Plaintiff did not suffer any actionable harassment and that, even if she did experience such harassment when Alcasid grabbed her and kissed her, the Hospital cannot be held responsible for such conduct because it took appropriate steps to end it. The court addresses each of these arguments in turn.

### 1.    Alcasid's Conduct Prior to the November 20, 1997 Incident

Prior to November 20, 1997, Plaintiff claims that she was subjected to Alcasid's sexual jokes, profanity, and degrading comments about women. She admits, however, that the jokes, comments, and profanity were never directed towards her, but claims that she overheard these comments whenever she passed by the waiting room where Alcasid would sit or whenever she ran into Alcasid. This behavior, which Alcasid does not entirely deny and which others have corroborated, was clearly vulgar, unprofessional, and childish. Nonetheless, the record does not reasonably support an inference that the misconduct prior to November 20, 1997 was so serious or pervasive that it created a hostile work environment within the meaning of Title VII.

As the Seventh Circuit has explained, "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers," does not cross the line between vulgarity and actionable sexual harassment. *Baskerville*, 50 F.3d at 430. For this reason, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County*, 121 S.Ct. at 1510 (citing *Faragher*, 524 U.S. at 788). Rather, Title VII is violated where the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)(quotation marks omitted).

Plaintiff's case is similar to several cases where the Seventh Circuit has found that the harassment was not actionable. For example, in *Adusumilli v. City of*

15

*Chicago*, plaintiff alleged that her co-workers subjected her to sexual harassment by their crude comments, including telling her she might be mistaken for a prostitute and making various remarks about bananas, rubber bands, and low neck tops. 164 F.3d 353, 357 (7th Cir. 1998). In addition, she complained that some of her co-workers stared at her and attempted to make eye contact, and one co-worker briefly touched her arm, fingers, or buttocks on four separate occasions. *Id.* In finding the harassment non-actionable, the Seventh Circuit explained that "the most salient feature of [this] harassment is its lack of severity." *Id.* at 361. Instead, the court found that these comments were closer to the Supreme Court's definition of "simple teasing" and "isolated incidents." *Id.*

Similarly, in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995), the Seventh Circuit found that plaintiff had not established a case of sexual harassment where her male supervisor referred to her as a "pretty girl" and a "tilly," made grunting noises when she wore a leather skirt, remarked that his office became very hot when she entered, suggested that the two should go dancing at a nightclub and that the plaintiff should "run around naked," commented about his sex life, and made gestures suggesting masturbation.

Alcasid's inappropriate comments in the work place were similar to those comments found to be non-actionable in *Adusumilli* and *Baskerville*. Additionally, unlike the comments in *Adusumilli* and *Baskerville*, Plaintiff admits that these comments were not even directed at her. This court has little patience for Alcasid's sophomoric behavior, but it must nevertheless find that his behavior prior to

November 20, 1997 did not constitute actionable harassment. *See also Spencer v.*
*Commonwealth Edison Co.,* No. 97 C 7718, 1999 WL 14486, at *8-9 (N.D. Ill. Jan. 6,
1999)(abusive language, derogatory jokes, comments about women, and clothing
depicting nude scenes did not constitute a hostile work environment where none of the
language, jokes, or comments were directed at plaintiff but, instead, merely occurred
in her presence); *Smith v. Brown,* 978 F. Supp. 806, 809 (N.D. Ill. 1997) (overheard
profanity is insufficient to constitute sexual harassment).

Nor is the court persuaded by Plaintiff's argument that a "culture of
harassment" put the Hospital on constructive notice of her concerns. An employer is
presumed to have notice of harassment "where the work environment is permeated
with pervasive harassment." *Wilson v. Chrysler Corp.,* 172 F.3d 500, 509 (7th Cir.
1999). As the court has just explained, even Alcasid's comments and jokes did not
make the work environment "permeated with pervasive harassment." Further, the
deposition testimony of Maila Parga, the former Director of Human Resources, as to
isolated incidents of inappropriate conduct by high level officials in the Hospital is not
relevant to the outcome of this motion, as Plaintiff has not shown any connection
between the alleged activities of these officials and Alcasid. Plaintiff has not
complained of any inappropriate conduct by these officials and Alcasid has admitted
that his actions were inappropriate, so it is not possible to argue that Alcasid believed
his behavior was condoned by the administration. Parga herself explains that most of
this behavior had changed by 1997, the relevant time period of this suit.

Finally, because the court concludes that Alcasid's conduct prior to November

20, 1997 does not constitute actionable harassment under Title VII it does not need to decide whether the Hospital responded properly to those complaints.[5]

## 2.    The Events on November 20, 1997

Unlike Alcasid's behavior before November 20, 1997, the events that occurred on November 20, 1997, come closer to actionable harassment. It is undisputed that on this day Alcasid brought Plaintiff into his office, locked the door, and began to kiss her hard. There are minor discrepancies between the stories, but even accepting Alcasid's version, the court finds that he acted inappropriately and offensively. In order for Plaintiff to recover on her sexual harassment claim, however, it is not enough for her to show that Alcasid's actions constituted harassment; she must also show that the Hospital unreasonably failed to take appropriate corrective action once it knew or had reason to know of the harassing conduct. *Baskerville*, 50 F.3d at 431-32; *Spencer*, 1999 WL 14486 at *7. An employer acts unreasonably if its response is unduly delayed, or if it is "not reasonably likely to prevent the misconduct from recurring." *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1990).

In this case, Plaintiff reported the incident to her direct supervisor, Nieves, the same day it occurred. Nieves scheduled a meeting for the very next day with Dickow, the Director of Human Resources. After hearing Plaintiff's complaint, Dickow allowed

---

[5]    There also exists case law about a "safe harbor" for employers where allegedly harassing conduct is too mild to require action on the employer's part. *See Adusumilli v. City of Chicago* at 362 and *Galloway v. General Motors Service Parts Corp.*, 78 F.3d 1164, 1168 (7th Cir. 1996). As neither party has addressed this issue, the court will not do so either.

her to work in a location separate from Alcasid for the day and then Dickow, Nieves, and Dr. Lopez, the Hospital's Medical Director, met with Alcasid and immediately suspended him for five weeks. Alcasid was allowed to return to the Hospital only after he met a number of conditions designed to prevent the harassment from recurring. Notably, since November 1997, Plaintiff has had two job opportunities which would have resulted in transfers out of the department. Plaintiff did not take either of the jobs. She admits that to date, Alcasid has not touched her again or acted inappropriately towards her.

Because the Hospital responded effectively and promptly to Plaintiff's complaint, it cannot be held liable for Alcasid's behavior even assuming such behavior did constitute actionable sexual harassment. Additionally, because Plaintiff herself explained that before the incident occurred she never felt unsafe being alone with Alcasid, the Hospital could not have foreseen or prevented this incident. To avoid Title VII liability, the employer's response to sexual harassment must be reasonable in light of the gravity of the harassment alleged, *Baskerville*, 50 F.3d at 432, and the Hospital's response was reasonably calculated to put an immediate end to the unwelcome touching and kissing that Plaintiff was subjected to on November 20, 1997 once it became aware of that conduct. The court notes further that Title VII does not require the Hospital to terminate Alcasid or to discipline him according to the Plaintiff's wishes, but only to end the harassing behavior in an effective and appropriate way, as it clearly did. *Saxton*, 10 F.3d at 535-36.

The Seventh Circuit has recognized that the presence of an employee who has

engaged in "particularly severe or pervasive harassment" can, of itself, create a hostile working environment. *Adusumilli*, 164 F.3d 353, 362. Here, however, Alcasid's misconduct prior to November 20, 1997 was not severe or pervasive. Plaintiff has not presented a material dispute as to the timeliness or efficacy of the Hospital's measures once she complained of the November 20 incident. Because the Hospital promptly took appropriate remedial action to address Alcasid's harassing behavior of November 20, 1997, and because Alcasid's conduct before that date does not constitute sexual harassment under Title VII, the Hospital is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Hospital's motion for summary judgment (Doc. No. 30) is granted. Because the remaining state law claims are dismissed without prejudice, Defendant Alcasid's motion for summary judgment with respect to the false imprisonment claim (Doc. No. 33) is denied without prejudice as moot.

ENTER:

Dated: June 28, 2001

REBECCA R. PALLMEYER
United States District Judge